Dr. William M. FELSHER, Appellant (Defendant Below),

v.

UNIVERSITY OF EVANSVILLE, Dr. James S. Vinson, Dr. Stephen G. Greiner, and Dr. Larry W. Colter, Appellees (Plaintiffs Below).

No. 82S04–0008–CV–477.

Supreme Court of Indiana.

Oct. 1, 2001.

William M. Felsher, pro se, Evansville, IN, Attorney for Appellant.

Thomas O. Magan, Scott F. Hill, Kahn, Dees, Donovan & Kahn, LLP, Evansville, IN, Attorneys for Appellees.

Daniel P. Byron, Steven D. Hardin, Jennifer F. Perry, Brad R. Maurer, McHale, Cook & Welch, Indianapolis, IN, Attorneys for Amici Curiae, Hoosier State Press Assn., LIN Television Corp., National Assn. of Broadcasters, and Society of Professional Journalists.

SHEPARD, Chief Justice.

We live in an age when technology pushes us quickly ahead, and the law struggles to keep up. In this case, we encounter for the first time assumption of identity via the Internet. A number of existing statutes and common law precepts seem to serve surprisingly well in this dramatic new environment.

Dr. William Felsher appeals the trial court's grant of summary judgment in favor of his former employer, the University of Evansville, and its officials. The court's order permanently enjoined Felsher from engaging in certain Internet activity including the creation and use of e-mail addresses and websites having an appearance of association with the University. He raises several issues, which we restate as:

I. Whether the University of Evansville is entitled to bring an action for invasion of privacy, and

II. Whether the injunction placed upon Felsher was necessary and proper.

We thus address protection afforded to corporations and individuals against unauthorized and retaliatory use of private or personal names on the Internet.

### Facts and Procedural History

The University of Evansville is a not-for-profit corporation, originally founded at Moores Hill, Indiana, in 1854.[1] Felsher was formerly a professor of French. The University terminated him in 1991.

In 1997, Felsher created Internet websites and electronic mail accounts containing portions of the names of Dr. James S. Vinson, President of the University; Dr. Stephen G. Greiner, Vice President for Academic Affairs; and Dr. Larry W. Colter, Dean of the College of Arts and Sciences.[2] Each of these addresses also contained the letters UE, which is a common abbreviation for the University of Evansville.

Felsher featured articles that he had written on the websites he created. The articles alleged wrongdoings by Vinson and other University employees. One article alleged that President Vinson violated the University Faculty Manual. In another article Felsher stated that one UE professor had publicly declared himself unqualified to teach one of his courses. (R. at 54–55.)

Using the e-mail accounts he created, Felsher sent mail to several universities nominating each of the University officials, in turn, for various academic positions. In his e-mail message, Felsher directed the reader to one of the web pages he had created as a reference for the nominee's activities.

The University, Vinson, Greiner and Colter filed this lawsuit alleging invasion of privacy, and Felsher then removed the e-mail addresses and the websites. Felsher later created another twelve websites containing roughly the same information as had appeared on the previously removed sites.

Pending resolution of the suit, the University sought and obtained a preliminary injunction prohibiting Felsher from engaging in certain Internet activities. The court denied Felsher's motion to remove

---

1. University of Evansville, *About The University of Evansville,* at http://www.evansville.edu/visitors/aboutue.asp (last visited Aug. 8, 2001).

2. The e-mail addresses were: JSVinsonUE@aol.com; SGreinerUE@aol.com; and LWColterUE@aol.com. (R. at 45–47, 84.)

The web sites contained the following URL: http://www.dynasty.net/ users/JSVinsonUE; later replaced by http://members.aol.com/ LWColterUE/Colter.htm; and http://members.aol.com/ SGreinerUE/SGGWebPage.htm. (*Id.*)

the University as a plaintiff. The trial court ultimately granted summary judgment in favor of the University and its officials, concluding that they have "a protectable privacy interest in their rights to the exclusive use of their identities .... [and that Felsher] invaded this interest when he appropriated the[ir] names ... for use in e-mail correspondence .... and for his benefit in creating the Internet web sites...." (R. at 281–82, 291.)

The court's order permanently enjoined Felsher from (1) "[a]ppropriating the names and likenesses" of the University, Vinson, Greiner, Colter, "or the name of any other person or individual associated with the University [ ] for any purpose"; (2) "USING THE E–MAIL ADDRESSES" he created "or any other e-mail address that incorporates the [plaintiffs'] names ... [including] 'UE' ... or the name of any other person or individual associated with the University"; (3) "[m]aintaining any web site" with a URL or address containing any of the plaintiffs' names, including UE, "or the names of any person or individual associated with the University ..."; and (4) "[n]ominating [ ] Vinson, [ ] Greiner, [ ] Colter or any person or individual associated with the University for positions with any other schools, colleges, or universities." (R. at 281–82.) [3]

The Court of Appeals affirmed. *Felsher v. Univ. of Evansville*, 727 N.E.2d 783 (Ind.Ct.App.2000). We grant Felsher's petition to transfer.

### Standard of Review for Summary Judgment

 Summary judgment is proper if the evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Ind. Dep't of Env't Mgmt. v. Med. Disposal Servs., Inc.*, 729 N.E.2d 577 (Ind.2000). On appeal, we construe all facts and reasonable inferences drawn from those facts in a light most favorable to the nonmoving party. *Butler v. Peru*, 733 N.E.2d 912 (Ind.2000). We carefully review the trial court's decision to ensure that the responding party was not improperly denied his day in court. *Id.*

### I. Invasion of Privacy and Corporations

Felsher first argues that the trial court erred because the University is not entitled to an invasion of privacy claim.[4] (Appellant's Br. at 13.) Felsher asserts that the right to privacy has an "intensely personal nature" and therefore applies to real persons and not to corporations. (*Id.* at 16.)

Representatives of several news organizations, as amici curiae, support Felsher's petition to transfer stating, "[W]ell established privacy law ... precludes corporations from bringing an action for invasion of privacy." (Amici Curiae Br. at 3.)[5]

---

**3.** Ironically, Dr. Greiner has in fact recently taken up a new position, as president of Virginia Intermont College. And Dr. Colter gave up his position as Dean of the College of Arts and Sciences, though he remains a UE professor and administrator. Patricia Swanson, *UE Vice President of Academic Affairs to Leave*, Evansville Courier & Press, Aug. 18, 2001, at B3. Dr. Vinson retired from his post in mid–2001.

**4.** Felsher, pro se, asserts that the University, "as with any corporation, cannot be a party to any Invasion of Privacy action." (Appellant's Br. at 12.) We do not interpret Felsher's statement literally to suggest that a corporation cannot be a defendant in an invasion of privacy action.

**5.** The amici curiae include Hoosier State Press Association, LIN Television Corporation, National Association of Broadcasters,

Amici accurately assert that no other state has recognized a claim for invasion of privacy by a corporation. (*Id.* at 2.)

The issue of whether a corporate entity is entitled to an invasion of privacy claim is one of first impression in Indiana. We begin our analysis by acknowledging the position taken in the Restatement (Second) of Torts, § 652A(1) (1977): "One who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other."

This Court has previously observed that the term "invasion of privacy" is a label used to describe "four distinct injuries: (1) intrusion upon seclusion, (2) appropriation of [name or] likeness, (3) public disclosure of private facts, and (4) false-light publicity." *Doe v. Methodist Hosp.*, 690 N.E.2d 681, 684 (Ind.1997) (citing Restatement (Second) of Torts, § 652A (1977)). In *Doe,* we examined the genesis of the privacy tort, apparently originating in an 1890 law review article written by Samuel Warren and future U.S. Supreme Court Justice Louis Brandeis. *Id.* Professor William Prosser later characterized the authors as heralding "the emergence of a new, if ill-defined, right to privacy" signaled by several decisions granting relief "on the basis of defamation or invasion of some property right, or a breach of confidence or an implied contract." *Id.* (quoting William L. Prosser, *Privacy,* 48 Cal.L.Rev. 383, 384 (1960)).

In *Doe,* we also noted the Second Restatement's view that the four injuries involved in the privacy tort are "only tenu-

ously related." *Doe,* 690 N.E.2d at 684. We explained that the four wrongs were separate and "united only in their common focus on some abstract notion of being left alone." *Id.* (citing Restatement (Second) of Torts, § 652A cmt. b (1977)). We indicated that "recognizing one branch of the privacy tort does not entail recognizing all four." *Id.* at 685. Our discussion of this history and the Second Restatement served as a prelude to our decision not to recognize a branch of the tort involving the public disclosure of private facts. *Id.* at 682, 693.

■ The only injury at issue here is appropriation.[6] The University argues that it may maintain an action for appropriation because the claim addresses a property interest rather than personal feelings. (Appellees' Br. at 8 (citing Restatement (Second) of Torts, § 652C cmt. a (1977) ("right created by [appropriation rule] is in the nature of a property right. . . .")).) The University also relies on Restatement § 652I, which says, "Except for the appropriation of one's name or likeness, an action for invasion of privacy can be maintained only by a living individual whose privacy is invaded." (Appellees' Br. at 8.)

■ While we agree that an appropriation claim involves a privacy issue "in the nature of a property right," we think the University's reliance on the exception set forth in the Restatement is misplaced. Each of the comments to Restatement § 652I negates the inference that a corporation is entitled to an appropriation claim.

and Society of Professional Journalists. (Amici Curiae Br. at 1–2.)

6. Felsher also contests the separate claim of invasion of privacy by Greiner and Colter for placing them in a false light before the public. (Appellant's Reply Br. at 13.) Because he raised this issue for the first time in his reply brief, it is waived. Ind. Appellate Rule

8.3(A)(7) (now Ind.App. R. 46(A)(8); *see also* Ind.App. R. 46(C)("No new issues shall be raised in the reply brief.")); *Senco Prod., Inc. v. Riley,* 434 N.E.2d 561, 569 (Ind.Ct.App. 1982) (citation omitted) ("Party cannot raise an argument for the first time on appeal in his reply brief.").

The first comment states that the privacy *right* is personal. The comment then states a *rule*: "The cause of action is not assignable, and it cannot be maintained by other persons...." Restatement (Second) of Torts, § 652I cmt. a (1977). The appropriation exception that follows addresses this *rule*, not the personal character of the *right*.

The second comment discusses the general requirement that "the action for the invasion of privacy cannot be maintained after the death of the individual whose privacy is invaded." *Id.*, cmt. b. This comment states an exception for appropriation actions due to its "similar[ity] to [an] impairment of a property right...." The exception is clarified as a recognition of survival rights in an appropriation action.

Finally, the third comment declares, without exception, "A corporation, partnership or unincorporated association has no personal right of privacy." *Id.*, cmt. c. The comment then states that a corporation has "no cause of action for any of the four forms of invasion covered by §§ 652B to 652E." *Id.* The following sentence in the comment indicates that although these sections (including § 652C) do not entitle a corporation claim, a corporation has "a limited right to the exclusive use of its own name or identity in so far as they are of use or benefit, and it receives protection from the law of unfair competition." *Id.* This comment suggests the existence of an analogous right that corporations may be afforded by the law of unfair competition.[7] *See id.* ("[T]his may afford it the same rights and remedies as those to which a private individual is entitled under the rule stated in § 652C.").

Therefore, we think these Restatement sections do not support the position that a corporation may bring an appropriation claim resting on notions of privacy.

Our assessment of the Second Restatement is consistent with an overwhelming majority of other states that have addressed the issue of corporate actions for invasion of privacy.

Among the most recent of these is *Warner–Lambert Co. v. Execuquest Corp.*, 427 Mass. 46, 691 N.E.2d 545 (1998). The Supreme Judicial Court noted that it had not previously been presented with the issue of "whether a corporation has a corporate right to privacy entitled to the protection of [Massachusetts privacy right law]."[8] *Id.* at 548. The court held that because "[a] corporation is not an 'individual' with traits of a 'highly personal or intimate nature,'" its privacy law did not extend protection to the corporation. *Id.* Justice Margaret Marshall[9] noted that other jurisdictions have "unanimously den[ied] a right of privacy to corporations." *Id.* (citations omitted). *See also N.O.C., Inc. v. Schaefer*, 197 N.J.Super. 249, 484 A.2d 729, 730–31 (1984) (corporation is incapable of the emotional suffering the privacy tort addresses: "humiliation and intimate personal distress"); *L. Cohen & Co. v. Dun & Bradstreet, Inc.*, 629 F.Supp. 1425, 1430 (D.Conn.1986) ("The law of privacy is [ ] concerned with the reputational interests of individuals rather than the less substantial reputational interests of corporations."); *Ion Equip. Corp. v. Nelson*, 110 Cal.App.3d 868, 168

7. Indiana's Unfair Competition law "regulate[s] the trade practices in the business of insurance" and is not applicable in this case. *See* Ind.Code Ann. § 27–4–1–1 (West 1993).

8. The Massachusetts statute provides, in part, "A person shall have a right against unreasonable, substantial or serious interference with his privacy." *Warner–Lambert Co.*, 691 N.E.2d at 548 n. 6 (citing Mass. Gen. Laws Ann. ch. 214, § 1B).

9. Justice Marshall has since become Chief Justice.

Cal.Rptr. 361, 366 (1980) ("A corporation is a fictitious person and has no 'feelings' which may be injured in the sense of the tort.").[10]

Although the Second Restatement suggests that unique circumstances may "give rise to the expansion of the four forms of tort liability for invasion of privacy," Restatement (Second) of Torts, § 652A cmt. c (1977), we decline to do so today. Instead, we explore the nature of relevant Internet activities and look to business law for protection against the misappropriation of a corporation's name.

## II. The Internet and Misappropriation

The Internet offers its subscribers access to a myriad of functions. These functions include the opportunity to communicate, share and even exploit intellectual property. As a prelude to our examination of business law provisions applicable to misappropriation on the Internet, we discuss the nature of the Internet and the deceptive activities that it confronts.

*Internet 101.* The Internet is an international aggregation of networks that connects numerous individual computer networks and computers.[11] This system of networks, also called the World Wide Web (WWW), has been described as "a highly diffuse and complex system over which no entity has authority or control." [12]

Most North American websites on the Internet register with an organization called InterNIC and receive a unique identifying number called an Internet Protocol (IP) address. For convenience, most of these numeric addresses are also assigned corresponding textual addresses. For example, Microsoft's IP address is 131.107.1.7, which can also be accessed by its textual address, microsoft.com. This textual address is referred to as the domain name. WWW registrants frequently select domain names that identify the registrant's name or interest, for the same reasons businesses and individuals have historically sought telephone numbers that were easy to remember. As visitors to websites delve further and further into a website beyond its home page, each web page is stored and accessed as a separate file located by a unique address called a Uniform Resource Locator (URL).

The last three letters of most domain names are the highest level domain reference and serve as the primary information Internet computers use to locate and identify the website sought. Current highest level domains include ".com" for businesses, ".net" for Internet services, ".edu" for educational institutions, ".gov" for government agencies, ".mil" for military connections, and ".org" for non-profit organizations. Therefore, an Internet user can connect to the White House's website by typing in the address field the following: http://www.whitehouse.gov.[13]

In addition to supporting the Web, the Internet also facilitates personalized com-

---

**10.** We discovered just one opinion to the contrary. In *H & M Associates v. City of El Centro*, 109 Cal.App.3d 399, 167 Cal.Rptr. 392, 399–400 (1980), the court stated that "regardless of their legal form, [businesses] have zones of privacy which may not be legitimately invaded." The case specifically involved a limited partnership that claimed only economic loss. *Id.* We note that the same court later explained in *Ion Equip.*, 168 Cal. Rptr. at 366, that there was no California case law that recognized a corporation's right to privacy.

**11.** *See Lockheed Martin Corp. v. Network Solutions*, 985 F.Supp. 949, 951 (C.D.Cal.1997), aff'd, 194 F.3d 980 (9th Cir.1999).

**12.** *Id.* (citing *ACLU v. Reno*, 929 F.Supp. 824, 830–45 (E.D.Pa.1996), aff'd, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997)).

**13.** The White House, *Welcome to the White House, at* http://www.whitehouse.gov (last visited Aug. 8, 2001).

munication through electronic mail (e-mail). The portion of e-mail addresses to the left of the "@" symbol is the user identification and typically identifies the account owner, while that portion of the address to the right of the "@" symbol is the domain name of the mail server. For example, a person can e-mail the President by addressing the message to president@whitehouse.gov.[14]

Nearly anyone can create a website or an e-mail address. Using readily available software, the task requires little skill or investment. An individual can currently acquire and register a unique domain name (web address), a customizable website and a corresponding e-mail address for about $70 a year.[15] Such ease and affordability have stimulated commercial businesses, educational institutions, organizations and individuals to participate in Internet communication.

People purchase websites, register domain names, and establish e-mail addresses to efficiently and effectively market and promote products, services and ideas to the literal "world" of the WWW. The ease of initiating these transactions also tempts the interests of wrongdoers, particularly in the context of domain name registrations.[16]

As alluded to earlier, the organization in charge of maintaining the registration of North American domain names is InterNIC. Initially, registration of domain names occurred on a first-come, first-served basis. This policy was discontinued after more businesses began registering names and conflicts in requested names multiplied.[17] The original policy permitted many enterprising individuals to attain domain names that were identical or significantly similar to trademarked names that had not yet been registered on the Internet.[18] These individuals, sometimes re-

14. The White House, *Contacting the White House, at* http://www.whitehouse.gov/contact (last visited Aug. 8, 2001).

15. Network Solutions, *Starter Web Page Package, at* http://www.networksolutions.com/en_US/catalog/dotcomessentials/ (last visited Aug. 8, 2001).

16. G. Gervaise Davis III, *Internet Domain Names and Trademarks: Recent Developments in Domestic and International Disputes: Enabling Electronic Commerce,* at 609, 615–16 (PLI Pat., Copyrights, Trademarks, & Literary Prop. Course, Handbook Series No. G0–00CW, 2000).

17. *Id.* at 548–49. To address this issue, the Internet Corporation for Assigned Names and Numbers formed the Uniform Dispute Resolution Procedure (UDRP) to provide an "expedited, electronic and inexpensive dispute resolution[s]" to those organizations that have adopted this method of dispute resolution. *See* Philip G. Hampton, II, *Legal Issues in Cyberspace,* at 587, 619 (PLI Pat., Copyrights, Trademarks, & Literary Prop. Course, Handbook Series No. G0–00OV, 2001). UDRP uti-

lizes single judges and slightly more expensive three-judge panels. Julia Angwin, *Are Domain Panels the Hanging Judges of Cyberspace Court?,* Wall St.J., Aug. 20, 2001, at B1. A study by Michael Geist, a professor at the University of Ottawa Law School, indicated that eighty-one percent of the 3,094 cases decided since the formation of UDRP in 1999 resulted in favor of the complaining party, i.e., the trademark holder. *Id.* The study also revealed that a trademark holder has a greater chance at a favorable result with a three judge panel. *Id.*

18. Registration policies now require applicants to: (1) "warrant that their use of the domain name w[ill] not interfere with or infringe the right of any third party in any jurisdiction with respect to trademark, service mark, trade name, company name, or any other intellectual property right"; (2) "indemnify the NSI from any third party claims"; and (3) "agree to relinquish a domain name if competing claimants present evidence that the granted domain name is identical to a valid and subsisting ... trademark...." Richard D. Harroch, *Legal Issues Associated with the Creation and Operation of Web Sites,* at

ferred to as cyberpredators, may be further sub-categorized according to their purpose for registering a popular name.

"Cybersquatters" are individuals who register domain names that are well known, not to use the addresses, but to re-sell them at a profit. For example, the domain name "wallstreet.com" was sold for $1 million. Cybersquatters who register previously trademarked names rarely prevail in litigation between the squatter and the holder of the trademark.[19]

Unlike cybersquatters, "copycats" register a domain name and use the address to operate a website that intentionally misleads users into believing they are doing business with someone else. Copycats either beat the legitimate organization to a domain name or register a close variation of an organization's domain name. The latter most frequently occurs when a unique spelling of an organization's name and/or domain name makes a close, but different spelling believable to a web user.

Copycat domain name use is "intentionally inimical to the trademark owner." For example, in *Planned Parenthood Federation of America, Inc. v. Bucci*, No. 97 Civ. 0629(KMW) 1997 WL 133313, at *1, *12 (S.D.N.Y. Mar.24, 1997), *aff'd*, 152 F.3d 920 (2d Cir.1998), *cert. denied*, 525 U.S. 834, 119 S.Ct. 90, 142 L.Ed.2d 71 (1998), the defendant was enjoined from using the domain name plannedparenthood.com, which he had previously registered and used to display anti-abortion material. Similarly, in *Jews for Jesus v. Brodsky*, 993 F.Supp. 282, 290–91, 313 (D.N.J.1998), the defendant was enjoined

from using the registered domain name "jewsforjesus.org," where he had previously created a website for the purpose of contradicting the teachings of the actual Jews for Jesus organization. Our previous example, whitehouse.gov, has also fallen prey to a notorious, though unlitigated, example of copycat use.

*Felsher's Folios.* Felsher's actions seem to fall in this second category of cyberpredators. He created the imposter websites and e-mail addresses for the sole purpose of harming the reputation of the University and its officials.

Thus, it might seem appropriate to grant the University the relief gained by the plaintiffs in *Planned Parenthood* and *Jews for Jesus*. These plaintiff organizations, however, based their claims on provisions of the Lanham Trade–Mark Act, 15 U.S.C. §§ 1114, 1125(a), (c) (trademark infringement, trademark dilution, unfair competition and false designation of origin). *Planned Parenthood*, 1997 WL 133313, at *3; *Jews for Jesus*, 993 F.Supp. at 294.

■ These trademark actions require commercial use of the domain name. *See* 15 U.S.C. § 1125(c)(4)(B) (1999) (noncommercial use of a mark is not actionable under this section). Courts have held, "The mere registration of a domain name, without more, is not a 'commercial use' of a trademark." *Jews for Jesus*, 993 F.Supp. at 307 (citations omitted). The Lanham Act does not include claims for non-commercial use of a trademark in order to "prevent courts from enjoining con-

537, 548–49 (PLI Pat., Copyrights, Trademarks, & Literary Prop. Course, Handbook Series No. G0–00D6, 2000).

**19.** *See Panavision Int'l v. Toeppen*, 141 F.3d 1316 (9th Cir.1998). In addition to previously existing trademark law, this problem is also remedied under the Anticybersquatting Con-

sumer Protection Act (ACPA), 15 U.S.C. § 1125(d)(1999). The ACPA creates liability for the registration or use of a domain name that is "identical or confusingly similar" to a distinctive mark where the registration or use is motivated by a "bad faith intent to profit from that mark." 15 U.S.C. § 1125(d)(1)(A)(1999).

stitutionally protected speech." *Id.* (citing *Panavision International, L.P. v. Toeppen,* 945 F.Supp. 1296, 1303 [C.D.Cal. 1996]).

In any event, the plaintiffs here do not assert a right to relief under the Lanham Act, so we need not debate whether the "commercial use" requirement for trademark actions is satisfied by domain name registration and corresponding presentation of information on a website.

■ *Applicable Law.* Amici curiae argue that an appropriate remedy for the misappropriation of a corporation name or likeness is found under the state unfair competition law and trademark statutes, as well as common law torts unrelated to notions of privacy, such as tortious interference with business relations.[20] (Amici Curiae Br. at 5.) We agree.

*Indiana Unfair Competition.* Indiana courts have created a cause of action for unfair competition, defined as "the attempt to create confusion concerning the source of the unfair competitor's goods." *Westward Coach Mfg. Co. v. Ford Motor Co.,* 388 F.2d 627, 633 (7th Cir.1968), *cert. denied,* 392 U.S. 927, 88 S.Ct. 2286, 20 L.Ed.2d 1386 (1968) (citations omitted). *See Rader v. Derby,* 120 Ind.App. 202, 89 N.E.2d 724 (1950); *Hartzler v. Goshen Churn & Ladder Co.,* 55 Ind.App. 455, 104 N.E. 34 (1914). This common law tort was historically considered "a subspecies of the class of torts known as tortious interference with business or contractual relations." William L. Prosser, *Prosser, Law of Torts* 956 (4th ed. 1971).[21]

In *Hartzler,* our appellate court described unfair competition as "any conduct, the natural and probable tendency and effect of which is to deceive the public so as to pass off the goods or business of one person as and for that of another...." 55 Ind.App. at 464, 104 N.E. at 37 (citation omitted). The court further explained:

> Unfair competition is always a question of fact. The question to be determined in every case is whether or not, as a matter of fact, the name or mark used by defendant has previously come to indicate and designate plaintiff's goods, or to state it another way, whether defendant, as a matter of fact, is by his conduct passing off his goods as plaintiff's goods, or his business as plaintiff's business.

55 Ind.App. at 465–66, 104 N.E. at 38 (citation omitted).

Professor Prosser's successor has characterized such causes of action in the following manner:

> Unfair competition ... does not describe a single course of conduct or a tort with a specific number of elements; it instead describes a general category into which a number of new torts may be placed when recognized by the courts. The category is open-ended, and nameless forms of unfair competition may be recognized at any time for the protection of commercial values.

W. Page Keeton, *Prosser and Keeton on the Law of Torts,* 1015 (5th ed. 1984). Professor Prosser himself illustrated unfair competition this way: "Though trade

---

**20.** Amici also suggest that a corporation may protect intellectual property interests in federal trademark and copyright law. (Amici Curiae Br. at 5.)

**21.** The elements of tortious interference with business relationships are "(1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship." *Levee v. Beeching,* 729 N.E.2d 215, 222 (Ind.Ct.App.2000).

warfare may be waged ruthlessly to the bitter end, there are certain rules of combat which must be observed. The trader has not a free lance. Fight he may, but as a soldier, not as a guerilla." William L. Prosser, *Prosser, Law of Torts* 956 (4th ed. 1971).

*Indiana Trademark Act.* The Indiana Trademark Act, contained in Indiana Code chapter 24-2-1, adopts a similar test for the infringement of trademarks registered in the state. The act does not "adversely affect the rights or the enforcement of rights in trademarks acquired in good faith at any time at common law." Ind.Code Ann. § 24-2-1-15 (West 1995). The act provides:

> [A]ny person who shall:
> (a) use, without the consent of the registrant, any reproduction, counterfeit, copy, or colorable imitation of a trademark registered under this chapter in connection with the sale, offering for sale, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or mistake or to deceive as to the source or origin of such goods or services ... shall be liable to a civil action by the owner of such registered trademark for any or all of the remedies provided in ... this chapter....

*Id.* at § 24-2-1-13. The act defines a "trademark" as "any word, name, symbol, or device or any combination thereof adopted and used by a person to identify goods or services made, sold, or rendered by him and to distinguish them from goods or services made, sold, or rendered by others." *Id.* at § 24-2-1-2(a). Registra-tion of the trademark with the office of the Secretary of State provides the registrant a remedy against the infringement of the registered trademark. *Id.* at §§ 24-2-1-4, 13, 14.[22]

█ It is frequently feasible to pour new wine into old legal bottles. A number of these statutes and common law rules might well suffice as a foundation for the relief sought by the University. They have not been pled, however, and we find it difficult to use them here as a basis to sustain the trial court's judgment, as we sometimes do, "on any grounds apparent in the record."[23]

## III. Injunctive Relief

Felsher argues that the trial court's grant of summary judgment and order permanently enjoining him was erroneous because it was unnecessary and too broad. (Appellant's Br. at 17, 20.)

*Necessity of Injunction.* Felsher argues that the plaintiffs were not in danger of irreparable harm in absence of either the temporary or permanent injunction. (Appellant's Br. at 21.) Felsher asserts that this danger does not exist because he voluntarily removed his website and e-mail addresses and "promise[d] to cease nominating." (Appellant's Br. at 20.)

The trial court based its decision to grant injunctive relief on its finding that Felsher composed and sent e-mail messages purposefully appearing to have been authored by either Vinson or Colter. (R. at 289.) Felsher used the e-mail to nominate Greiner and Colter for employment

---

22. "Any owner of a trademark registered under this chapter may proceed by suit to enjoin the manufacture, use, display, or sale of any counterfeits or imitations thereof, and any court of competent jurisdiction may grant injunctions to restrain such [activity].... " *Id.* at § 24-2-1-14(a).

23. *See Wilkinson v. State,* 743 N.E.2d 1267, 1269 (Ind.Ct.App.2001) (citing *Alford v. State,* 699 N.E.2d 247, 250 (Ind.1998)).

and refer recipients of the mail to contrived web sites containing resumes of each nominee. (R. at 289–90.) The court also found that the recipients of the e-mail mistakenly believed that the messages were sent by Vinson or Colter. (R. at 289.) The court recognized the plaintiffs' injury by finding:

15. The misappropriation of Plaintiffs' names and reputations was for Defendant's advantage in that it enabled him to pursue a personal vendetta against the University.

16. Defendant's unauthorized misappropriation of Plaintiffs' names, reputations and likenesses has invaded Plaintiffs' rights to privacy, and as a direct and proximate result of [D]efendant's acts, Plaintiffs have suffered irreparable injury.

(R. at 290.)

The reasonable inference that may be drawn from these findings is that Felsher might well continue his retaliatory endeavors via the Internet if he is not enjoined from doing so. Felsher removed the objectionable e-mail accounts and websites only after he received notice of the plaintiffs' complaint. His assertion that this voluntary action, along with his promise, relieves any necessity for an injunction is unsupported. Removed e-mail accounts and websites are easily replaced. Felsher's actions are only facially remedial and provide no assurance that he will permanently discontinue his Internet activities against the University and its officers.

■ The trial court's findings and the reasonable inferences that they provide confirm that the trial court acted within its discretion when it enjoined Felsher.

*Scope of Injunction.* The trial court enjoined Felsher from appropriating the name, or using or maintaining a website or e-mail address incorporating the name, of the plaintiffs and also "any other person or individual associated with the University . . . for any purpose." (R. at 281.) The court also enjoined Felsher from nominating the plaintiffs "or any other person or individual associated with the University . . . for positions with any other schools, colleges or universities." (R. at 281.)

Felsher argues that the court's permanent injunction was "unreasonably overbroad in its inclusion of an infinite number of anonymous non-plaintiffs." (Appellant's Br. at 17.) Felsher asserts that the injunction should have been limited to the individuals named in the complaint: Vinson, Greiner and Colter.

■ Injunctions must be narrowly tailored, and never more extensive in scope than is reasonably necessary to protect the interests of aggrieved parties. *Day v. Ryan,* 560 N.E.2d 77, 83 (Ind.Ct. App.1990). The reputation of the University is directly proportional to the reputation of the individuals it employs. Having noted Felsher's propensity to continue his pursuit against the University and the University officers, the trial court did not abuse its discretion by extending its injunctive order in paragraphs 1–3 to include "any other person or individual associated with the University . . . ." (R. at 281.)

■ However, the fourth paragraph of the permanent injunction requires revision. It enjoins Felsher from "[n]ominating Dr. James S. Vinson, Dr. Stephen G. Greiner, Dr. Larry W. Colter or any other person or individual associated with the University of Evansville for positions with any other schools, colleges or universities." (*Id.*) Taken literally, the order prevents Felsher from sending nominations even under his own name. This relief is unnecessary to protect the University officers from misappropriations by Felsher and thus exceeded the trial court's discretion.

This error can be resolved by modifying the paragraph to clarify that Felsher is enjoined from creating the appearance that his nominations are from anyone other than himself.

Felsher also argues that the trial court erred when it enjoined him from appropriating the "names and likenesses" of the University, its officials or any other person associated with the University. (Appellant's Br. at 19; R. at 281.) Felsher's misappropriation involved only the use of the plaintiffs' names. He essentially argues that the order was too broad because the plaintiffs did not present evidence indicating that he misappropriated any "likenesses." (*Id.*)

■ The phrase "name or likeness" is commonly used in the context of misappropriation. *See* Restatement (Second) of Torts, § 652C (1977). It embraces the concept of a person's character, which is legally protected against appropriation by another for his own use or benefit. The terms are appropriately paired due to their similar purpose and function: identification.[24]

■ The trial court's findings indicate that Felsher intentionally invaded the privacy of the plaintiffs by creating and modifying websites and e-mail addresses containing their names. It is reasonably foreseeable that Felsher will misappropriate the likenesses of the plaintiffs by further availing himself of the Internet's capacity to feature photographs, images or other representations of identity. Therefore, the trial court properly included the phrase "names and likenesses" when it enjoined Felsher.

24. "The first form of invasion of privacy to be recognized by the courts consists of the appropriation, for the defendant's benefit or advantages, of the plaintiff's name or likeness." W. Page Keeton, *Prosser and Keeton on the*

**Conclusion**

We affirm the trial court's injunction on behalf of the three University officers, and other individuals, with the modest modification just mentioned.

Concluding that the University itself has no claim in the nature of common law privacy, we reverse that portion of the injunction relating to the institution, noting that it may be entitled to similar relief under other law not so far pleaded.

DICKSON, SULLIVAN, BOEHM, and RUCKER, JJ., concur.

*Law of Torts* 851 (5th ed. 1984). "[I]t is the appropriation of identity that is important." David A. Elder, *The Law of Privacy* 393 (1991).