Robert M. **TRENT**, Jr., Appellant–
Plaintiff,

v.

**NATIONAL CITY BANK OF INDIANA, as Trustee of the Trust Under Agreement of Marie Dorothy Koffenberger Dated November 26, 1997, et al., Appellees–Defendants.**

No. 49A04–0905–CV–261.

Court of Appeals of Indiana.

Dec. 22, 2009.

---

Appeal from the Marion Superior Court;
The Honorable Tanya Walton Pratt,

Judge[1]; Cause No. 49D08–0307–TR–1721.

Perry R. Staub, Jr., Taggart Morton, LLC, New Orleans, LA, Anne M. Hamilton, Taft Stettinius & Hollister LLP, Indianapolis, IN, Attorneys for Appellant.

Jarrell B. Hammond, Stefanie R. Crawford, Sonia C. Das, Lewis Wagner, LLP, Indianapolis, IN, Attorneys for Appellee National City Bank.

## OPINION

BAKER, Chief Judge.

Appellant-plaintiff Robert M. Trent, Jr. (Robert), appeals from the trial court's order granting summary judgment in favor of appellee-defendant National City Bank of Indiana, as Trustee of the Trust Under Agreement of Marie Dorothy Koffenberger Dated November 26, 1997 (the Bank) on Robert's complaint alleging undue influence. Robert raises the following arguments: (1) there are issues of fact regarding whether the Bank unduly influenced Robert's grandmother in the execution of a trust; (2) there are issues of fact regarding whether the Bank breached a fiduciary duty owed to Robert under his grandfather's and/or grandmother's trusts; and (3) Indiana Code section 30–4–3–5 should have prevented the Bank from assuming a role as trustee of his grandmother's trust. Finding no error, we affirm.

### FACTS

#### The Family

Marie Dorothy Koffenberger (Marie) and her husband, James E. Koffenberger (Koffenberger), had two children, Susan and James E. Koffenberger, Jr. (James,

Jr.). Susan went on to have four children: Robert and appellee-defendant James L. Trent (James) were born of Susan's first marriage; Amy E. Herrick (Amy) and Amanda L. Herrick (Amanda) were born of Susan's second marriage.[2]

#### The JEK Trust

Koffenberger was a high-ranking officer at Eli Lilly & Co. and, over the course of his career, amassed stock shares in Eli Lilly and other companies that were worth millions of dollars. In 1976, Koffenberger executed a will bequeathing, among other things, an undivided one-half interest in his estate to Marie.

The remainder of Koffenberger's estate was placed into the James E. Koffenberger Trust (JEK Trust), of which the Bank was trustee. Among other things, the JEK Trust stated that, at the least, Marie was to receive the net income of the trust once a year, taking "into consideration and account the income and resources otherwise available to her of which my Trustee shall have knowledge." Appellant's App. p. 186. Additionally, the JEK Trust contains the following directive:

> If at any time or from time to time the income payable hereunder to [Marie] shall be insufficient in the sole judgment of my Trustee adequately *to provide for her care, support, maintenance and general welfare,* then the Trustee, in the Trustee's sole discretion, may pay out of the corpus of the trust … to or for the benefit of my said wife such sum or sums as the Trustee shall deem advisable for such purposes, taking into consideration and account the income and resources otherwise available to my said

---

1. Judge Charles J. Dieter entered the order granting summary judgment in favor of National City Bank of Indiana on March 22, 2007. Judge Walton Pratt entered the order granting the Bank's motion for entry of final judgment and directing entry of final judgment on April 13, 2009.

2. James, Jr., also had four children, but only Susan's children are involved in this appeal.

wife of which my Trustee shall have knowledge.

*Id.* at 188–89 (emphasis added). The document contained a similar provision relating to Koffenberger's children.

The trust also provided that, upon Marie's death, the Bank was to divide the residuary estate into "as many equal shares as there are children of mine then surviving, including any child of mine who shall be deceased leaving issue then surviving," and distribute the estate "to my said children or their issue, per stirpes and not per capita. . . ." *Id.* at 187. Koffenberger died in 1977, survived by Marie, James, Jr., and Susan.

### Marie's Struggles

Following Koffenberger's death, Marie entered a years-long struggle with severe alcoholism. In 1989, her treating physician recommended that she be institutionalized for a variety of mental and physical ailments. In September 1989, a guardianship was created. The guardianship was terminated in 1992, based on two letters from Marie's treating physician that she was cured. After 1992, no further guardianship proceedings were conducted, and Marie lived independently or in assisted-living facilities. There is no evidence that she required assistance managing her finances between 1992 and November 26, 1997. In March 1998, Marie was diagnosed with Alzheimer's Disease, and she died in 2002.

### Marie's Wills

From July 1994 until November 1997, Marie had three different wills. All of those wills were executed in the state of Florida, and the Bank had no role in preparing or drafting those wills. Her first will, executed in July 1994, left all of her personal and real property to her grandson, James, and his wife, Paula. It devised the balance of her estate assets in the following manner: 50% to James, 20%

to Robert, 15% to Amy, and 15% to Amanda. In June 1996, Marie executed her second will, leaving all of her personal and real property to James and devising the balance of her estate in the following manner: 65% to James, 10% to Paula, with Robert, Amy, and Amanda equally sharing the remaining 25%. Marie's third will revised the distribution of the balance of her estate such that James received 75% and Robert, Amy, and Amanda shared the remaining 25%.

### The MDK Trust

Throughout the years, Marie maintained a relationship with the Bank, retaining an agency account at the Bank and obtaining the Bank's assistance on other unrelated matters. In June 1996, Marie received information from the Bank regarding estate planning options and addressing her concerns about the effect that taxes might have on her estate beneficiaries.

On August 18, 1997, Marie, James, Paula, Marie's accountant, and Marie's attorney, Thomas Ewbank, met with Bank representatives at the Bank to discuss Marie's estate planning options. Attorney Ewbank was a former Bank employee but had resigned from his employment at the Bank in 1995 and was a partner with a law firm at the time of the meeting. John Lee, a Bank trust officer, attended the meeting and generally recommended a trust account over an agency account for someone of Marie's age. Marie advised Lee at some point that her respective relationships with her grandchildren affected her generosity to them.

Following the meeting, Marie decided to create a trust with Ewbank serving as her attorney and the Bank serving as trustee. Neither Lee nor the Bank had any involvement drafting the trust document; rather, the trust was drafted by Ewbank. On November 26, 1997, the Marie Dorothy

Koffenberger Trust (the MDK Trust) was executed. Neither Lee nor the Bank is a beneficiary of the trust. The MDK Trust provides that James and/or Paula and/or their children will receive 75% of the trust corpus. It further devises 8.34% of the corpus to Robert and 8.33% each to Amy and Amanda. Moreover, the MDK Trust provides that a "gross gift" was to be made annually to James of all property in the trust that exceeded $8 million in net market value. *Id.* at 84.

### The Lawsuit

On April 5, 2004, Robert filed a complaint against numerous defendants, including James, Paula, Amy, Amanda, Ewbank, Lee, and the Bank. With respect to the Bank, Robert alleged, among other things, that it "should have but failed to take steps to verify [Marie's] capacity prior to accepting its role as Trustee of the MDK Trust ..." *Id.* at 453. Additionally, Robert alleged that the Bank violated Indiana Code section 30–4–3–5 by assuming a role as trustee of both the JEK and MDK Trusts. Finally, Robert alleged that the Bank had unduly influenced Marie in the execution of the MDK Trust.

During discovery, Robert was deposed and explained the basis for his allegation of undue influence:

Q. You have alleged in your complaint, that [the Bank] ... exerted undue influence upon your grandmother at a meeting in August of 1997. Could you relate the facts that support that allegation that you have made in the complaint?

A. I don't have any specifics. It just seems very obvious and apparent from the outcome of the will and trust. Like I said earlier in this deposition, I—it's incomprehensible to, I think, anyone that knew my grandmother that she would do anything that dramatically different

from my grandfather's trust and will. She worshiped the ground he walked on. We all knew that. And if he felt strongly enough at that time to dispose of his estate the way he did, my grandmother would have followed suit.

Q. Well, what I am wanting to know is the allegation you have made against the [Bank] as trustee about undue influence from John Lee ... at a meeting in August, 1997. What facts do you have to support that allegation?

A. It's outside my knowledge. I don't have any specific ...

Q. ... What you're telling me is you have no knowledge of any specific facts that underlie your allegation of undue influence against [the Bank] as trustee, and more specifically, John Lee as its representative at that meeting in August, 1997?

A. Yes.

Q. Okay. ... [A]re there any other facts that may exist against [the Bank] as it relates to the allegations of undue influence?

A. No, not to my knowledge.

*Id.* at 153–54. During the course of litigation, Robert further asserted that the Bank had breached a fiduciary duty owed to him as a beneficiary of the MDK Trust, asserting that Marie was mentally incompetent at the time she executed the trust and that the Bank had failed to determine her mental capacity to create a trust.

On March 1, 2005, the Bank moved for summary judgment on Robert's claims against the Bank. Following a hearing, the trial court granted the Bank's motion on March 22, 2007, finding and concluding as follows:

1. There is no genuine issue as to any material fact.
2. John Lee exerted no undue influence upon [Marie] in relation to the revocable trust agreement executed by her on 11/26/97.
3. John Lee breached no legal duty owed to [Marie] or to [Robert] by any act or omission in relation to the revocable trust agreement executed by [Marie] on 11/26/97.
4. [The Bank] exerted no undue influence upon [Marie] in relation to the revocable trust agreement executed by her on 11/26/97.
5. [The Bank] breached no legal duty owed to [Marie] or to [Robert] by any act or omission in relation to the revocable trust agreement executed by [Marie] on 11/26/97.
6. [The Bank] is entitled to judgment as a matter of law.

*Id.* at 19. The trial court certified its grant of summary judgment to the Bank as final, and Robert now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

Summary judgment is appropriate only if the pleadings and evidence considered by the trial court show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Owens Corning Fiberglass Corp. v. Cobb*, 754 N.E.2d 905, 909 (Ind.2001); *see also* Ind. Trial Rule 56(C). On a motion for summary judgment, all doubts as to the existence of material issues of fact must be resolved against the moving party. *Owens Corning*, 754 N.E.2d at 909. Additionally, all facts and reasonable inferences from those facts are construed in favor of the nonmoving party. *Id.* If there is any doubt as to what conclusion a jury could reach, then summary judgment is improper. *Id.*

An appellate court faces the same issues that were before the trial court and follows the same process. *Id.* at 908. The party appealing from a summary judgment decision has the burden of persuading the court that the grant or denial of summary judgment was erroneous. *Id.* When a trial court grants summary judgment, we carefully scrutinize that determination to ensure that a party was not improperly prevented from having his or her day in court. *Id.*

### II. Undue Influence

■■■ First, we must consider whether there are genuine issues of fact regarding Robert's allegation that the Bank exerted undue influence over Marie in the process of the execution of the MDK Trust.[3] Undue influence is defined as " 'the exercise of sufficient control over the person, the validity of whose act is brought into question, to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised.' " *Nichols v. Estate of Tyler*, 910 N.E.2d 221, 228 (Ind.Ct.App.2009) (quoting *Gast v. Hall*, 858 N.E.2d 154, 166 (Ind.Ct. App.2006)). Under certain circumstances, there is a presumption of undue influence: "[w]hen transactions occur between a dominant and a subordinate party which benefit the dominant party, 'the law imposes a presumption that the transaction was the result of undue influence exerted by the dominant party, constructively fraudulent, and, thus void.' " *Id.* at 229 (quoting *Hamilton v. Hamilton*, 858 N.E.2d 1032, 1036 (Ind.Ct.App.2006)). If there is no

---

3. Robert insists in his Reply Brief that he is not arguing that the Bank exerted undue influence over Marie. Reply Br. p. 5. To the contrary, that is *precisely* what his complaint alleges. Appellant's App. p. 459–60. Thus, we will address the issue.

applicable presumption, undue influence can be established upon a showing of the imposition of power by one party to deprive the other party of the exercise of free will. *Id.* at 228.

■ Here, the evidence in the record is undisputed that Marie intended to make some sort of estate plan—specifically, either to retain her agency account or create a trust—when she met with Bank representatives in August 1997; she was merely trying to decide what tools would make the most sense for her situation. Lee generally recommended a trust account over an agency account for someone of Marie's age, and she chose to take that advice. Neither Lee nor the Bank is a beneficiary of the MDK Trust, and although the Bank earned a fee for the trust administration, the fee it charged was virtually the same amount charged to customers with an agency account. Appellant's App. p. 158. Thus, there is no evidence that this transaction benefited the Bank.

Furthermore, it is undisputed that Marie was represented at the meeting by an attorney and an accountant, that those individuals helped her make the decision to enter into the trust, and that her attorney, not the Bank, drafted the Trust documents. Additionally, although the Bank and Marie had sustained a business relationship over the years, they did not have a fiduciary relationship until the MDK Trust was executed. We are unwilling to conclude that the Bank owed a general broad-sweeping fiduciary duty to Marie relating to the execution of a trust simply because it provided services to her as a financial institution as to her other investments and savings or because it administered the JEK Trust, to which she was a beneficiary. Under these circumstances, therefore, Marie was not a "subordinate" party to the transaction. Given that conclusion and the fact that the Bank did not benefit, there is no presumption of undue influence.

Robert spends a great deal of time focusing on Marie's mental acuity at the time of the execution of the MDK Trust. Initially, we note that although she had undeniably suffered multiple problems in the past, there is scant evidence that, after the guardianship was removed in 1992, she continued to experience issues relating to mental and/or physical competency. Although there is no evidence in the record that Marie was mentally incompetent at the time of the execution of the trust, Robert directs our attention to the statement of her treating physician that, in June 1997, 79–year–old Marie was "slowing down" and had a "slightly impaired" memory. *Id.* at 284. Thus, Robert argues that she was susceptible to undue influence based on her history of medical problems, advanced age, and the eventual diagnosis of Alzheimer's, which occurred approximately six months after the creation of the Trust.

We find this court's opinion in *In re Estate of Meyer* to be instructive on this issue. 747 N.E.2d 1159 (Ind.Ct.App.2001). In *Meyer*, after a trust settlor died, his family alleged that Meyer's attorney had exerted undue influence over his client. Among other things, family members pointed to medical testimony that Meyer had suffered from Alzheimer's for many years prior to the execution of the trust and had also suffered a series of strokes. Thus, the family members argued that Meyers's medical history left him "susceptible to undue influence." *Id.* at 1164. This court found that "[w]hether Meyers's medical condition made him 'susceptible' to undue influence is of no consequence unless the [family members] make some showing that [Meyers's attorney] exercised undue influence over Meyer. They have made no such showing." *Id.* at 1168.

Here, likewise, even if we assume solely for argument's sake that Marie was susceptible to undue influence, it is of no moment unless Robert can make some showing that the Bank actually exercised undue influence over Marie. But there is simply no evidence in the record whatsoever that Marie's decision to create the MDK Trust was influenced by the Bank in any way. Marie requested the meeting and sought out the advice of Bank representatives, and was represented at the meeting by an attorney and an accountant. The Bank had no role in determining the amount of the trust, the identity of trust beneficiaries, or the amount that each beneficiary would receive. Marie's attorney, rather than the Bank, drafted the trust documents. None of the alleged memory deficits alleged by Robert occurred during the dealings with the Bank, and there is no evidence whatsoever that the Bank was aware of any memory problems or that it used such knowledge for its benefit.

Indeed, Robert admitted in his deposition that he had no evidence aside from his own hunch that the Bank exercised undue influence over his grandmother. Moreover, Marie's devises in the MDK Trust were entirely consistent with her estate planning decisions of the past several years, in which she had devised a majority of her estate to James and his family, dividing the remainder between Susan's three other children. Under these circumstances, we find that there are no genuine issues of fact relating to the Bank's alleged exercise of undue influence over Marie. Thus, the trial court did not err for this reason by granting summary judgment in the Bank's favor.

### III. Alleged Duties Owed to Robert

Robert next argues, essentially, that the Bank breached duties that it owed to him by "permitt[ing] *James* to exercise undue influence over [Marie], resulting in serial wills that progressively favored James, large annual gifts to James with disastrous tax consequences, and, ultimately, [the MDK Trust, which] gave James an enormous amount of Marie's estate." Reply Br. p. 6 (emphasis in original) (footnotes omitted). For the purpose of our analysis of the Bank's duties to Robert, we will assume—solely for argument's sake—that there is a genuine issue of fact as to whether or not James exercised undue influence over Marie.

### A. JEK Trust

■ First, Robert contends that the Bank breached a fiduciary duty to him under the JEK Trust by letting James exercise undue influence over Marie in the myriad ways outlined above. *See In re Stuart Cochran Irrevocable Trust,* 901 N.E.2d 1128, 1138 (Ind.Ct.App.2009) (noting that a trustee's duties to trust beneficiaries are established by statute and by the terms of the trust), *trans. denied.* Robert directs our attention to the following provision in the JEK Trust:

> If at any time or from time to time the income payable hereunder to [Marie] shall be insufficient in the sole judgment of my Trustee adequately *to provide for her care, support, maintenance and general welfare,* then the Trustee, in the Trustee's sole discretion, may pay out of the corpus of the trust ... to or for the benefit of my said wife such sum or sums as the Trustee shall deem advisable for such purposes, taking into consideration and account the income and resources otherwise available to my said wife of which my Trustee shall have knowledge.

*Id.* at 188–89 (emphasis added). According to Robert, this provision obligated the Bank to "remain apprised of the circumstances surrounding Marie's care, support, maintenance, and general welfare." Reply Br. p. 4. He argues, in essence, that if the

Bank had had actual knowledge of the facts surrounding Marie's care, support, maintenance, and general welfare, then it would and/or should have stepped in to prevent James from exerting undue influence over Marie.

We cannot agree. It is obvious, from the plain language of this provision, that it was included in the JEK Trust to further protect Marie's *financial* well-being. If, in the trustee's judgment, the trust income was insufficient to provide for Marie's needs, then the trustee was authorized to pay funds out of the corpus of the trust to or for the benefit of Marie. The Bank's *only* responsibility under this section was to determine whether Marie needed more money and, if it determined that she did, pay that money to her.

There is no evidence whatsoever in the record that Marie had a need for additional finances during her lifetime or that a lack of access to JEK Trust funds was a barrier to Marie's ability to seek appropriate treatment for her care, support, maintenance, and general welfare. There is no evidence that Marie, or someone on her behalf, sought and was denied additional distributions under the JEK Trust. Under these circumstances, we can only conclude that the Bank did not breach this duty as specified by the JEK Trust.

We also note, in any event, that there is no dispute that the funds distributed to Marie under the JEK Trust during her lifetime were authorized distributions. Once those funds were distributed, they ceased being property of the JEK Trust—or future property of the remainder beneficiaries—and were the exclusive property of Marie, who had no obligation to use the trust distributions in a particular manner,

or for the benefit of Robert. Marie had no obligation to devise her estate in the same manner as Koffenberger or to treat all of her grandchildren equally as a condition of receiving a distribution under the JEK Trust. And it follows logically that, by permitting Marie to make her own estate planning decisions with her own property—which was not in any way attached to the JEK Trust—the Bank breached no duties to the remainder beneficiaries of the JEK Trust. Thus, we find no error in this regard.

### B. MDK Trust

■ Robert also seems to argue that, by permitting Marie to execute the MDK Trust, the Bank breached a fiduciary obligation to him pursuant to that Trust. The Bank, however, owed no fiduciary duty to Robert with respect to the MDK Trust until that document was executed.[4] Before that time, it owed him a duty relating only to the JEK Trust. That duty was outlined in the JEK Trust document, and as we have already explained, the Bank's actions herein did not breach that duty.

There is no suggestion in the record that, following the execution in the MDK Trust, the Bank failed to administer it according to its terms. Under these circumstances, therefore, we simply cannot conclude that the Bank has breached a duty to Robert that it owed pursuant to the MDK Trust. Thus, the trial court did not err for this reason by granting summary judgment in the Bank's favor.

### IV. Conflict of Interest

■ Finally, Robert argues that summary judgment is improper because Indiana Code section 30–4–3–5(a) prevented the Bank from serving as trustee of

---

4. To the extent that Robert argues that the Bank owed—and breached—a duty to *him* to determine Marie's mental capacity before she executed the trust, we note that he has offered no authority supporting the proposition that such a duty exists, and we have found none. Thus, we decline to reverse on this basis.

both the JEK Trust and the MDK Trust. The relevant portion of that statute provides as follows:

If the duty of the trustee in the exercise of any power conflicts with the trustee's individual interest or the trustee's interest as trustee of another trust, the power may be exercised only under one (1) of the following circumstances:

(1) The trustee receives court authorization to exercise the power with notice to interested persons as the court may direct.

(2) The trustee gives notice of the proposed action in accordance with IC 30–2–14–16 and:

(A) the trustee receives the written authorization of all interested persons to the proposed action within the period specified in the notice of the proposed action; or

(B) a beneficiary objects to the proposed action within the period specified in the notice of the proposed action, but the trustee receives court authorization to exercise the power.

(3) The exercise of the power is specifically authorized by the terms of the trust.

I.C. § 30–4–3–5(a). Here, Robert argues that the Bank's interest as trustee of the JEK Trust should have prevented it, pursuant to this statute, from agreeing to act as trustee of the MDK Trust.

Having examined the statute and the facts herein, we conclude that the statute does not apply. The Bank's "individual interest" is not implicated, inasmuch as it was not named as a beneficiary of either trust. And its interest as trustee of the JEK Trust in no way conflicts with its interest as trustee of the MDK Trust. As noted above, although Marie certainly funded part of the MDK Trust with distributions she had received from the JEK Trust, after she received those distributions, they belonged solely and exclusively to her, with no strings attached. She was free to do with those funds as she wished. Nothing—other than Robert's sense of entitlement—required Marie to follow the same estate plan as her husband had done. Put another way, the way in which Marie chose to devise her estate in the MDK Trust *in no way* affected or implicated the JEK Trust. Those two trusts are completely unrelated aside from the identity of some of the parties involved. Therefore, it is evident that there was no conflict whatsoever between the Bank's role as trustee of the two trusts. We find, therefore, that the trial court did not err for this reason by granting summary judgment in Robert's favor.

In sum, we have found that there are no facts in the record supporting Robert's allegation that the Bank exerted undue influence over Marie, that there are no facts in the record supporting Robert's allegation that the Bank breached any duties to him, and that there are no facts in the record supporting Robert's contention that Indiana Code section 30–4–3–5 applies and should have prevented the Bank from agreeing to act as trustee of the MDK Trust. Thus, we affirm.[5]

---

5. To the extent that Robert argues that the trial court failed to address all of his claims against the Bank, we disagree. He contends that the trial court failed to make a specific ruling relating to Marie's wills, which Robert argues are invalid because the Bank "fostered" James's alleged undue influence over Marie. Appellant's Br. p. 29. We agree with Robert's inference that "the trial court rejected those claims by its silence" together with its order awarding summary judgment in the Bank's favor. Appellant's Br. p. 29. We summarily affirm the trial court's order in this respect based on our analysis herein.

The judgment of the trial court is affirmed.

KIRSCH, J., and DARDEN, J., concur.