

FILED

Jun 16 2020, 8:37 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEYS FOR APPELLANT | ATTORNEYS FOR APPELLEES |
|---|---|
| Michael Einterz, Jr. | Brian C. Hewitt |
| Mike Einterz | Christopher J. Mueller |
| Einterz & Einterz | Hewitt Law & Mediation, LLC |
| Zionsville, Indiana | Indianapolis, Indiana |

# I N  T H E
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Mary Eve Kassen Moriarty, | June 16, 2020 |
| *Appellant-Defendant,* | Court of Appeals Case No. 19A-PL-2342 |
| v. | Appeal from the Hamilton Superior Court |
| Catherine C. Moriarty and Paula A. Bowers, | The Honorable Matthew C. Kincaid, Special Judge |
| *Appellees-Plaintiffs,* | Trial Court Cause No. 29D01-1709-PL-8319 |

**Crone, Judge.**

## Case Summary

[1]     Mary Eve Kassen Moriarty (Eve) appeals the trial court's order entering

judgment in favor of Catherine C. Moriarty (Cathy) and Paula A. Bowers

(Paula) (collectively Daughters) on their claim to reject the probate of the

purported last will and testament of William J. Moriarty (the Purported Will)

on the basis of lack of testamentary capacity and/or undue influence and on
their claim of tortious interference with inheritance.  Eve contends that the trial
court abused its discretion at trial by allowing Daughters to reopen their case-in-
chief to call her as a witness.  She also argues that the trial court's legal
conclusions are clearly erroneous.  Finding no error, we affirm.

## Facts and Procedural History

[2] The unchallenged findings of fact show that William and Doreen Moriarty are
Daughters' parents.[1]  On April 1, 2016, Doreen died.  William and Doreen had
been married for fifty-eight years.

[3] The Moriarty family was a "closely knit, loving family."  Appealed Order at 18
(finding #175).  William was a devoted husband and father.  Cathy and Paula
had close relationships with both parents, although at times Paula and William
would disagree.  Paula has two children, Nicholas and Jackson, who both had
loving relationships with William and Doreen.  Based on numerous specific
statements by William over many years, Paula and Cathy each expected to

---

[1] The trial court, for the most part, adopted Daughters' proposed findings and conclusions thereon.  Eve
argues that the trial court's order is clearly erroneous because the citations in the trial court's order do not
correspond with the official transcript on appeal.  It appears that Daughters obtained a certified transcript to
prepare their proposed findings, and that that transcript was paginated differently than the official transcript
on appeal.  Daughters were kind enough to provide a key in their appellees' appendix as an aid to locating
the citations in the trial court's order in the transcript on appeal.  Of the order's more than 250 findings and
conclusions, Eve contends that only the footnote in finding 223 is not supported by the record on appeal.
That footnote is immaterial to the resolution of the issues on appeal.  There is nothing in the findings that we
rely on in this opinion that is not accurately represented in the transcript on appeal.  In her reply brief, Eve
requests that we strike Daughters' appellees' appendix.  Despite her failure to make this request as a motion
as required by Indiana Appellate Rule 34, we deny her request.

inherit one-half of William's assets. In addition, William discussed his intention that everything he and Doreen owned would be split between Cathy and Paula with Doreen's sister, Elaine Suurendonk, who had significant interaction with the Moriarty family over several decades.

[4] Dr. Edward Fry is a cardiologist who treated both Doreen and William. Doreen was his patient from 2007 until her death. In April 2015, William became Dr. Fry's patient when William was hospitalized and diagnosed with congestive heart failure (CHF). At an appointment in May 2016, William reported to Dr. Fry that he had been under a great deal of stress due to the prolonged and complex illness of his wife who had recently passed away.

[5] Eve, who had met William at Holy Spirit Parish when Doreen was still living, began dating him within weeks after Doreen died. Cathy learned about Eve in an email from William but did not realize that they were dating. William never mentioned Eve by name to Paula or invited Paula to meet Eve. Paula noticed a change in her relationship with William when he stopped calling, emailing, and otherwise communicating with her after Father's Day 2016. William had never stopped communicating with Paula before. Cathy did not understand why William suddenly stopped communicating with Paula. In June 2016, William did not want Cathy to visit him in Indianapolis, and she thought that was very strange. In August 2016, Cathy visited William, and he told her that he was engaged to be engaged, but she did not understand what he meant.

[6] On October 25, 2016, Eve married William. This was Eve's fourth marriage. William's daughters, grandsons, sister, sister-in-law, and longtime close friends were not invited to the wedding. Sometime before the wedding, "Cathy found out that Eve planned to marry William," but Paula was not informed about the wedding, and she was shocked to learn that William married Eve so soon after Doreen's death. *Id.* at 4, 21 (#32, #214, #215). Although Suurendonk had maintained regular contact with William following Doreen's death, he did not tell her that he was going to be married, and she was surprised to learn that William had married Eve so soon after Doreen's death. William's longtime friend Danial Kocher, who maintained regular contact with William, was not informed that William was going to marry Eve and was shocked to learn that William married Eve. Eve never invited Paula or Cathy to her home, did not invite them to William's surprise birthday party, and did not meet Paula until the day before William died.

[7] "After Eve married William, Paula and Cathy were not permitted to participate in William's medical care as they had previously with William and with Doreen." *Id.* at 11 (#100). "Dr. Fry viewed this as a significant change from the family dynamic over the previous nine years." *Id.* "Eve was present at the office visit when William told Dr. Fry that he did not want Paula and Cathy involved in his medical care." *Id.* "During the course of Dr. Fry's treatment of William, Dr. Fry diagnosed William with anxiety and depression, and Dr. Fry's medical records reference symptoms of anxiety and depression nine times from April 2016 through William's death in May 2017." *Id.* (#108).

On November 17, 2016, William and Eve closed on the purchase of a home on Glen Ridge Circle (Glen Ridge House) in Fishers for $412,620.11. The Glen Ridge House was paid for by wire transfer from an account owned solely by William, which had been funded by the sale of his prior home and a money market account owned solely by him. The amount of money William spent on the Glen Ridge House was out of character for him.

"A patient with CHF, like William, would become physically reliant on others for assistance with activities of daily living." *Id*. at 12 (#112). In March 2017, Eve fired William's home healthcare service provider, the same provider who had served Doreen. William said nothing, which was out of character for him.

On March 20, 2017, William signed a request to surrender his Prudential life insurance policy. Eve initially testified that she had not seen the request before William died, but she admitted to writing everything on it except William's signature. The policy's surrender value of $11,591.80 was deposited into an account, which was owned jointly by William and Eve.

On April 6, 2017, William executed the Purported Will. Ex. 3. The Purported Will directs all tangible personal property and the entire residue of William's estate to be distributed to Eve if she survives him and nominates Eve to serve as personal representative of his estate. The Purported Will also provides that if Eve does not survive William, then the personal property and residue of his

estate are to be distributed to Daughters, per stirpes. The Purported Will included a self-proving clause.[2]

[12] The Purported Will was prepared by attorney Greg Cagnassola. Eve had been a client of Cagnassola for eight to ten years. Cagnassola departed significantly from his ordinary practices when meeting with and preparing an estate plan for William. Other than dropping off a draft of the Purported Will at William's house, Cagnassola did not have in-person interaction with William until the signing of the Purported Will at William's house. Eve was home when the Purported Will was signed. Eve prepared the check that William signed to pay for the preparation of the Purported Will. Also on April 6, William signed a general durable power of attorney naming Eve as his attorney-in-fact and a healthcare power of attorney naming Eve as his healthcare power of attorney, both effective immediately. Eve never signed a will or trust naming William as a beneficiary. Eve never named William as her healthcare power of attorney or healthcare representative or attorney-in-fact.

[13] In April 2017, although he was no longer driving, William owned a 2015 Lincoln MKX truck that was paid for and had low mileage. Eve leased an Acura, which had a net amount of $4860.38 due to the dealership. On April 27, 2017, William and Eve traded in their cars and purchased a 2017 Lexus RX

---

[2] "A self-proving clause creates a rebuttable presumption that the will was properly executed." *Scribner v. Gibbs*, 953 N.E.2d 475, 481 (Ind. Ct. App. 2011). "[P]roper execution of a will requires a writing, a signature, acknowledgment, publication, presence, and attestation by capable witnesses." *Id.* (citing HENRY'S INDIANA PROBATE LAW & PRACTICE § 29.03 (2010)).

350 for $62,973.01. The net amount due to purchase the Lexus, after credit for the value of William's truck and the amount due on Eve's Acura were applied, was $44,533.39. A check for $40,000 was written from a bank account owned solely by William. It was out of character for William to trade in his truck and to spend that amount of money on a new car.

[14] On May 7, 2017, William died. On May 22, 2017, Daughters filed a verified petition for supervised administration of William's estate. The following day, Eve filed a petition for probate of the Purported Will without court supervision. Ultimately, the two causes were consolidated, and a special administrator was appointed.

[15] In September 2017, Daughters initiated the underlying action by filing a verified complaint alleging that the Purported Will was invalid because William was of unsound mind when he executed it and/or the Purported Will was a product of undue influence and alleging that Eve tortiously interfered with their inheritance. Prior to trial, Daughters requested that the trial court issue findings and conclusions thereon pursuant to Indiana Trial Rule 52(A).

[16] On July 29, 2019, a three-day hearing was commenced. Daughters presented their case-in-chief, calling nine witnesses. When Daughters rested, Eve moved for involuntary dismissal pursuant to Indiana Trial Rule 41(B), which the trial court denied. Eve then presented her defense, calling five witnesses. She did not call herself as a witness although she was named in her final witness list. After Eve rested, Daughters moved to reopen their case-in-chief to call Eve as a

witness. Tr. Vol. 3 at 243. The trial court granted the request, over Eve's objection, for the limited purpose of examining Eve and gave Eve the opportunity for cross-examination and to call additional witnesses. *Id*. at 245-48. Eve's counsel did not ask Eve any questions on cross-examination, call any additional witnesses, or ask for a continuance to call or recall other witnesses.

[17] On September 26, 2019, following the parties' submissions of proposed findings of facts and conclusions thereon, the trial court issued a twenty-eight-page order, consisting of over 250 findings and conclusions, which in relevant part provides as follows:

### K. Testimony of Dr. Stephen Rappaport

158. Dr. Stephen Rappaport is a geriatrician and has been an expert witness in legal disputes for over twenty years. He frequently determines patients' decision-making capacity and treats patients regularly who are suffering from anxiety, depression, and cardiac conditions, including CHF.

….

160. Dr. Rappaport reviewed extensive medical records and other case records in order to render an opinion concerning the impact of William's physical and affective (mood) abnormalities on his psychological vulnerability to undue influence.

….

172. This Court adopts the opinion of Dr. Rappaport and finds that William's physical and psychological impairments and the

under-treatment of his depression and anxiety impacted William's ability to reasonably evaluate and judge the treatment of him by third parties.

173. This Court adopts the opinion of Dr. Rappaport and finds that William's physical and psychological impairments and the under-treatment of his depression and anxiety impacted William's psychological vulnerability and susceptibility to undue influence.

174. The Court adopts the opinion of Dr. Rappaport and finds that, on April 6, 2017, (a) William's ability to reasonably evaluate and judge the treatment of him by third parties was impaired, and (b) William suffered increased psychological vulnerability and susceptibility to undue influence.

….

**S. William lacked the mental capacity to determine Paula and Cathy's deserts, with respect to their treatment of and conduct toward him.**

236. Based on all the evidence, and specifically based on, among other things (a) the testimony of [Daughters], Ms. Suurendonk, and William's long-time friends that William would never have excluded [Daughters] from his life or estate plan, (b) the expert medical testimony of Dr. Rappaport that William lacked the capacity to reasonably evaluate and judge the treatment of him by third parties, and (c) William giving Doreen's sentimental personal property to Scott Bowers at a time when he and Paula were in the midst of a highly contentious, drawn-out divorce, the Court finds that William lacked the mental capacity to determine Paula and Cathy's deserts, with respect to their treatment of and conduct toward him.

**T. William was susceptible to undue influence.**

237. Based on all the evidence, and specifically based on, among other things, (a) the death of Doreen, (b) William's virtually untreated anxiety and depression, (c) William's severe CHF and other medical conditions, (d) William's isolation from his family and long-time friends, [and] (e) William's dependency on others, this Court finds that William was susceptible to undue influence.

**U. Eve exercised undue influence over William.**

238. The Court finds that Eve exercised undue influence over William and bases that finding upon all of the evidence and specifically upon (a) Eve's marriage to William less than seven months after Doreen died, (b) Eve's involvement in the grief ministry at Holy Spirit in which William was a participant, (c) the Purported Will and non-probate transfers representing a dramatic shift in William's intent regarding the passing of his estate less than six months after the wedding and only one month before his death, (d) the testimony of Eve that she contributed at least $232,500 in physical cash to William toward the purchase of the Glen Ridge House and the Lexus, which this Court found not credible, (e) the involvement by Eve in the procurement of and payment for the Purported Will, (f) the involvement of Eve in the surrendering of William's Prudential life insurance policy, (g) the purchase of the Lexus only ten days before William's death when William was no longer driving, (h) the lack of any effort by Eve to form relationships with Paula, Cathy, and William's other family and long-time friends, (i) Eve's firing of William's long-time medical caregiver, (j) William's significant reliance on Eve, (k) the wedding occurring without any of William's family or long-time friends attending or even being invited, (l) Eve inheriting virtually all of William's assets to the exclusion of his daughters and grandsons, and (m) Eve's demeanor in court, which consisted of a flat affect during emotional testimony of Paula and Cathy about their father's last hours and during Eve's

own testimony, which leaves this factfinder with no confidence that Eve married William because she loved him and with the conclusion that Eve planned to take all of William's money all along.

## II.   CONCLUSIONS OF LAW

….

### i. Capacity to Execute a Will

241.   Every person is presumed to be of sound mind to execute a will until the contrary is shown. *Hays v. Harmon*, 809 N.E.2d 460, 464 (Ind. Ct. App. 2004), *trans. denied*. To rebut this presumption, a party must show that the testator lacks mental capacity at the time of executing his will to know: (1) the extent and value of his property; (2) those who are the natural objects of his bounty; (3) their deserts, with respect to their treatment of and conduct toward him, and (4) to retain such facts in mind long enough to have a will prepared and executed. [*Gast v. Hall*, 858 N.E.2d 154, 165 (Ind. Ct. App. 2006)] (internal citations omitted); *McReynolds v. Smith*, 86 N.E. 1009, 1010 (Ind. 1909); *Barr v. Sumner*, 107 N.E. 675, 679 (Ind. 1915). While it is the testator's soundness of mind at the time of executing the will that is controlling, evidence of the testator's mental condition prior to the date of execution is admissible, as it relates to the testator's mental state when executing his will. *Gast*, 858 N.E.2d at 165 (internal citations omitted). A testator must possess all essential elements of testamentary capacity; if one essential element is lacking, the will of the testator is not valid. *Lowe v. Talbert*, 177 N.E. 339, [340] (Ind. Ct. App. 1931) (en banc).

242.   Based on the findings above, the Court concludes that William lacked the mental capacity to determine Paula and

Cathy's "deserts, with respect to their treatment of and conduct toward him."

243. Accordingly, the Court concludes that William lacked sufficient mental capacity to validly execute the Purported Will.

### ii. Undue Influence

244. Undue influence is defined as "the exercise of sufficient control over the person, the validity of whose act is brought into question, to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised." *In re Estate of Wade*, 768 N.E.2d 957, 962 (Ind. Ct. App. 2002), *trans. denied*. It is an intangible thing that only in the rarest instances is susceptible of what may be termed direct or positive proof. *McCartney v. Rex*, 145 N.E.2d 400, 402 (Ind. Ct. App. 1957) ("The difficulty is also enhanced by the fact universally recognized that he who seeks to use undue influence does so in privacy"). As such, undue influence may be proven by circumstantial evidence, and the only positive and direct proof required is of facts and circumstances from which undue influence may reasonably be inferred. *Haas v. Haas*, 96 N.E.2d 116, 120 (Ind. Ct. App. 1951), *reh'g denied*. "As circumstances tending in a slight degree to furnish ground for inference of fraud or undue influence, it is proper to consider the character of the proponents and beneficiaries, and interest or motive on their part to unduly influence the testator, and facts and surroundings giving them an opportunity to exercise such influence." *Davis v. Babb*, 125 N.E. 403, 406 (Ind. 1919). Where a person makes false statements and accusations to a testator concerning the objects of the testator's bounty, with the intention and effect of alienating the testator's affections and causing the testator to make certain testamentary dispositions of property, the will may be declared void for undue influence. *Friedersdorf v. Lacy*, 90 N.E. 766 (Ind. 1910).

245.  Based on the evidence, including reasonable inferences the Court draws from the facts and circumstances and further based on the findings above, the Court concludes that: William was susceptible to undue influence, Eve exercised undue influence over William at the time he executed the Purported Will, and the Purported Will was a product of Eve's exercise of undue influence over William.

**B. Tortious Interference with Inheritance**

….

247.  Here, Paula and Cathy have filed an action to contest the validity of the Purported Will, which, if successful, would allow them to inherit assets from William's probate estate.  However, the will contest remedy would not allow Paula and Cathy to inherit or benefit from any of William's assets that pass outside his probate estate.  The Court concludes that Paula and Cathy have stated a valid claim for tortious interference with inheritance.  William was susceptible to undue influence and Eve exercised undue influence at the time that (a) the Glen Ridge House was purchased and deeded to William and Eve as husband and wife, (b) the Lexus was purchased and titled to William and Eve as joint owners, (c) Eve became a joint owner in the bank account ending 0541 at The National Bank of Indianapolis, the bank account ending 864 at Fifth Third Bank, and the bank account ending 1434 at PNC Bank (the "Joint Accounts").  Eve's exercise of undue influence over William is tortious interference with Paula's and Cathy's expected inheritance.

248.  But for Eve's tortious interference with Paula and Cathy's expected inheritance, the Glen Ridge House, the Lexus, and the Joint Accounts would have passed through William's probate estate.

249. The Court concludes that [Daughters] have, by clear and convincing evidence, established that William did not intend for Eve to inherit the value of the Joint Accounts.

Appealed Order at 16-18, 24-28 (some citations omitted).

[18] The trial court entered judgment in favor of Daughters, declared the Purported Will to be invalid, rejected the probate of the Purported Will, and ordered that William's estate be distributed as an intestate estate. *Id*. at 28. The trial court also entered judgment in favor of Daughters on their claim for tortious interference with inheritance, ordered Eve to transfer title of the Glen Ridge House and Lexus to William's estate, and entered a money judgment against Eve in constructive trust in favor of William's estate in the amount reflecting the value of the Joint Accounts received by Eve: $54,665.83. *Id*. This appeal ensued.

# Discussion and Decision

[19] Initially, we note that where, as here, the trial court enters findings of fact and conclusions thereon at a party's request pursuant to Indiana Trial Rule 52(A), our standard of review is well settled:

> First, we determine whether the evidence supports the findings and second, whether the findings support the judgment. In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. We do not reweigh the evidence, but consider only the evidence favorable to the trial court's judgment. Challengers must establish that the trial court's findings are clearly erroneous. Findings are clearly

erroneous when a review of the record leaves us firmly convinced a mistake has been made. However, while we defer substantially to findings of fact, we do not do so to conclusions of law. Additionally, a judgment is clearly erroneous under Indiana Trial Rule 52 if it relies on an incorrect legal standard. We evaluate questions of law de novo and owe no deference to a trial court's determination of such questions.

*Trabucco v. Trabucco*, 944 N.E.2d 544, 548-49 (Ind. Ct. App. 2011) (quoting *Balicki v. Balicki,* 837 N.E.2d 532, 535-36 (Ind. Ct. App. 2005)*, trans. denied* (2006)), *trans. denied*. In addition, when findings of fact are unchallenged, this Court accepts them as true.[3] *Henderson v. Henderson*, 139 N.E.3d 227, 232 (Ind. Ct. App. 2019). As such, if the unchallenged findings are sufficient to support the judgment, we will affirm. *See Kitchell v. Franklin*, 26 N.E.3d 1050, 1059 (Ind. Ct. App. 2015) (concluding that even if appellate court disregarded the challenged findings, unchallenged findings were sufficient to support trial court's conclusion that plaintiff's claim was unreasonable and groundless so as to support trial court's award of attorney fees), *trans. denied*.

## Section 1 – The trial court did not abuse its discretion by permitting Daughters to reopen their case-in-chief.

[20]     We first address Eve's challenge to the trial court's decision to allow Daughters to reopen their case-in-chief to call her as a witness. We observe, "it is within

---

[3] In a footnote in her reply brief, Eve argues that certain findings are unsupported by the evidence, but arguments raised for the first time in a reply brief are waived. *See Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 593, n.6 (Ind. 2001) (concluding that issue raised for first time in reply brief was waived); Ind. Appellate Rule 46(C) ("No new issues shall be raised in the reply brief.").

the discretion of the trial court to permit a party to present additional evidence or testimony once the party has rested, once both parties have rested, or after the close of all of the evidence." *Collyear-Bell v. Bell*, 105 N.E.3d 176, 186 (Ind. Ct. App. 2018); *Quigg Trucking v. Nagy*, 770 N.E.2d 408, 413 (Ind. Ct. App. 2002); *Preuss v. McWilliams*, 141 Ind. App. 602, 606, 230 N.E.2d 789, 791 (1967). In arguing whether the trial court abused its discretion, both parties cite to *Flynn v. State*, 497 N.E.2d 912 (Ind. 1986), wherein our supreme court stated,

> Among the factors which weigh in the exercise of discretion are whether there is any prejudice to the opposing party, whether the party seeking to reopen appears to have rested inadvertently or purposely, the stage of the proceedings at which the request is made, and whether any real confusion or inconvenience would result from granting the request.

[21]    *Id*. at 914.[4]  "Two conditions must be shown to exist to justify a court of appellate jurisdiction in setting aside a ruling made by a trial court in the exercise of judicial discretion: 1) that the action complained of must have been unreasonable in light of all attendant circumstances or it must have been clearly untenable or unreasonable; and 2) that such action was prejudicial to the rights of the complaining party." *Id*. at 916.

---

[4]  All the cases citing the *Flynn* factors are criminal cases: *Walker v. State*, 587 N.E.2d 675, 677 (Ind. 1992); *Ford v. State*, 523 N.E.2d 742, 745-46 (Ind. 1988); *Alvarado v. State*, 89 N.E.3d 442, 447 (Ind. Ct. App. 2017), *trans. denied* (2018); *Gilman v. State*, 65 N.E.3d 638, 641 (Ind. Ct. App. 2016); *Moss v. State*, 13 N.E.3d 440, 446 (Ind. Ct. App. 2014), *trans. denied*; *Saunders v. State*, 807 N.E.2d 122, 126 (Ind. Ct. App. 2004); *White v. State*, 726 N.E.2d 831, 835 (Ind. Ct. App. 2000), *trans. denied*. Although criminal cases differ from civil cases in many respects, the *Flynn* factors, while not an exclusive or comprehensive list, may be helpful in civil cases. We consider them here because both parties rely on them.

[22] Eve argues that the trial court abused its discretion because it did not apply the *Flynn* factors. We are unpersuaded. We note that when a trial court exercises its discretion in ruling on a party's motion to reopen its case-in-chief, there is no requirement that the court specifically articulate the reasons for its ruling. Furthermore, the "trial court is presumed to know the law and apply it correctly." *Holtzleiter v. Holtzleiter*, 944 N.E.2d 502, 506 (Ind. Ct. App. 2011). We also note that while the *Flynn* factors may be helpful in many cases, each case presents its own unique circumstances that a trial court must weigh in exercising its discretion: "Matters committed to judicial discretion are those requiring an on-the-spot decision made in light of the trial judge's knowledge, sense of fairness and equity, and the facts and circumstances present in the courtroom." *White v. White*, 655 N.E.2d 523, 532 (Ind. Ct. App. 1995). We find no error on this basis.

[23] Eve also argues that Daughters intentionally rested their case without calling her as a witness and that she was severely prejudiced because Daughters had the benefit of hearing her evidence. At trial, Eve objected to Daughters' motion to reopen their case-in-chief on the grounds that Daughters had the opportunity to call all the witnesses they wanted and chose not to call her, and permitting them to call her as a witness after the close of evidence would prejudice her case because she had based her defense on the evidence Daughters presented in their case-in-chief and Daughters had the benefit of hearing her witnesses. Tr. Vol. 3 at 243, 245-46. The trial court was clearly aware of these circumstances and took them into account in exercising its discretion. In addition, the trial court

considered Indiana Evidence Rule 611, which governs the mode and order of examining witnesses and presenting evidence. *Id.* at 245. The trial court explained that the rule required it to "exercise reasonable control over the mode and order of examining witnesses and presenting the evidence so as to make those procedures effective for determining the truth, avoid wasting time, and protecting witnesses from harassment and undue embarrassment." *Id.* The trial court mitigated the threat of prejudice to Eve by granting her the opportunity for cross-examination and to call additional witnesses. She declined to do either.

[24] This Court has previously observed that

> "[w]hile a trial judge has some discretion in refusing a request to reopen the case to supply testimony adequate to avoid a nonsuit, yet this discretion should be liberally exercised in behalf of allowing the whole case to be presented. It is the usual course to allow the additional evidence, and, whenever the trial judge refuses to allow it, some good reason should appear for such exercise of his discretion. The trial of a case is not a mere game for testing the skills and vigilance of contesting lawyers, but is an investigation instituted for the purpose of ascertaining truth."

*Sanders v. Ryan*, 112 Ind. App. 470, 41 N.E.2d 833, 836 (1942) (reversing trial court's denial of plaintiff's motion to reopen evidence made after defendant's motion for judgment on the evidence had been granted). Under the circumstances present here, we cannot say that the trial court's decision to

allow Daughters to reopen their case was unreasonable.[5] *See Gorman v. State*, 463 N.E.2d 254, 257 (Ind. 1984) (no prejudice found in reopening case where witness was known to defense and defense was given opportunity to cross-examine witness and call additional witnesses in his behalf); *Gilman v. State*, 65 N.E.3d 638, 643 (Ind. Ct. App. 2016) (trial court did not abuse its discretion by allowing State to reopen its case, after defendant's closing argument, to present rebuttal evidence); *Quigg Trucking*, 770 N.E.2d at 413 (trial court did not abuse its discretion by allowing plaintiffs to reopen their case after defendant moved for judgment on the evidence). The trial court did not abuse its discretion.

## Section 2 –The trial court's legal conclusions that the Purported Will is invalid are not clearly erroneous.

[25]     Eve also contends that the trial court clearly erred in concluding that the Purported Will is invalid because William lacked sufficient mental capacity and Eve exercised undue influence over William. Initially, we note that any

---

[5] Eve argues that she was called as a witness "only to impugn her character and attempt to impeach her credibility without foundation" and that this was improper pursuant to Indiana Code Section 34-45-4-1 and *Slayton v. State*, 481 N.E.2d 1300, 1303 (Ind. 1985). Appellant's Br. at 35. However, she did not object to Daughters' motion to reopen their case on this basis. Therefore, this argument is waived. *See Anonymous, M.D. v. Hendricks*, 994 N.E.2d 324, 327 (Ind. Ct. App. 2013) ("Generally, a party cannot raise an argument for the first time on appeal."). Also, in her appellant's reply brief, Eve argues that she objected to certain testimony and documentary evidence on the basis of relevancy. *See* Appellant's Reply Br. at 27 n.7 (citing Tr. Vol. 4 at 2, 4, and 6). In fact, the trial court sustained Eve's objection to the documentary evidence on the basis of relevancy. Tr. Vol. 4 at 6. In any event, whether the trial court abused its discretion in admitting specific evidence on the basis of relevancy is a different question from whether the trial court abused its discretion in permitting Daughters to reopen their case. We conclude that the issue whether the trial court abused its discretion in admitting specific evidence on the basis of relevancy is waived for failure to present a cogent argument. *See* Ind. Appellate Rule 46(A)(8)(a) (requiring that contentions in appellant's brief be supported by cogent reasoning and citations to authorities, statutes, and the appendix or parts of the record on appeal); *Loomis v. Ameritech Corp.*, 764 N.E.2d 658, 668 (Ind. Ct. App. 2002) (failure to present cogent argument waives issue for appellate review), *trans. denied*.

interested person may contest the validity of a will based on "(1) the unsoundness of mind of the testator; (2) the undue execution of the will; (3) that the will was executed under duress or was obtained by fraud; or (4) any other valid objection to the will's validity or the probate of the will." Ind. Code § 29-1-7-17. The burden of proof in a will contest is on the opponent of the will. Ind. Code § 29-1-7-20. Thus, Daughters bore the burden of proof on the issues they raised: that the Purported Will is invalid because William lacked the mental capacity to execute it and/or that it was a product of Eve's undue influence over William.[6] Testamentary capacity and undue influence represent two separate grounds for invalidating a will, and the trial court found that the Purported Will was invalid on both grounds. Accordingly, if the judgment can be supported on either ground, we may affirm. Because we conclude that the trial court did not clearly err in concluding that the Purported Will is the product of Eve's undue influence over William, we need not address her arguments relating to his testamentary capacity.

[26] "Undue influence is defined as 'the exercise of sufficient control over the person, the validity of whose act is brought into question, to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised.'" *In re Estate of Compton*, 919 N.E.2d 1181, 1185-86

---

[6] Undue influence is a type of undue execution. *Matter of Estate of Parlock*, 486 N.E.2d 567, 569 (Ind. Ct. App. 1985).

(Ind. Ct. App. 2010) (quoting *Trent v. Nat'l City Bank of Ind.*, 918 N.E.2d 646, 651 (Ind. Ct. App. 2009), *trans. denied* (2010)), *trans. denied*.

> In order to affect a will, undue influence must subjugate the mind of a testator to the wishes of the person exerting the influence. It must be such as to control the mental operations of the testator in the making thereof, overcome his power of resistance and oblige him to make a disposition of his property which he would not have made if left freely to act according to his own wishes and pleasures.

*Lindinger v. Lindinger*, 126 Ind. App. 463, 466, 130 N.E.2d 75, 77 (1955). "It may flow from the abuse of a confidential relationship in which 'confidence is reposed by one party in another with resulting superiority and influence exercised by the other.'"[7] *Carlson v. Warren*, 878 N.E.2d 844, 851 (Ind. Ct. App. 2007) (quoting *In re Neu*, 588 N.E.2d 567, 570 (Ind. Ct. App. 1992)).

[27]   When considering whether a will is invalid because it is a product of undue influence, the mental state of the testator is a factor the courts consider. *Nichols v. Estate of Tyler*, 910 N.E.2d 221, 229 (Ind. Ct. App. 2009) (quoting *Gast*, 858

---

[7] Although not discussed by the parties, we note that "[u]nder Indiana law, a confidential relationship sufficient to support an undue influence claim may arise either as a matter of law or may arise under the particular facts of a case." *Scribner v. Gibbs*, 953 N.E.2d 475, 484 (Ind. Ct. App. 2011). A confidential relationship as a matter of law creates a presumption of undue influence. *Id*. "Confidential relationships as a matter of law include relationships such as attorney-at-law and client, attorney-in-fact and the one granting the power of attorney, guardian and ward, principal and agent, pastor and parishioner, and parent and child." *Id*. Here, there was no confidential relationship as a matter of law between Eve and William, and therefore a presumption of undue influence did not arise. "Where there is no confidential relationship as a matter of law, the plaintiff bears the burden of establishing either that "the dominant party dealt with superior knowledge of the matter derived from a fiduciary relationship, or dealt from a position of overpowering influence as to the subordinate party." *Id*. (quoting *Carlson*, 878 N.E.2d at 851).

N.E.2d at 166). However, "[c]omplete unsoundness of mind is not necessary to support a finding of undue influence; rather, weakness of mind when combined with other factors is sufficient."[8] *Id*. As we have often explained,

> Undue influence is an intangible thing that only in the rarest instances is susceptible of what may be termed direct or positive proof. That difficulty is enhanced by the fact that one who seeks to use undue influence does so in privacy. Accordingly, undue influence may be proven by circumstantial evidence, and the only positive and direct proof required is of facts and circumstances from which undue influence reasonably may be inferred. The following circumstances tending to support an inference of undue influence may be properly considered by our Court: (1) the character of the beneficiary; (2) any interest or motive the beneficiary might have to unduly influence the testator; and (3) the facts and surrounding circumstances that might have given the beneficiary an opportunity to exercise such influence.

*In re Rhoades*, 993 N.E.2d 291, 300-01 (Ind. Ct. App. 2013) (quotation marks omitted) (citing *Gast*, 858 N.E.2d at 166). *See also Davis v. Babb*, 190 Ind. 173, 125 N.E. 403, 406 (1919) ("[I]t is proper to consider the character of the proponents and beneficiaries, and interest or motive on their part to unduly

---

[8] Eve argues that the trial court's conclusions as to undue influence are clearly erroneous because the trial court applied an incorrect legal standard in finding #241 by relying on *Lowe*, 177 N.E. 339. The legal principles recited in finding 241 apply to determining whether a testator has sufficient mental capacity to execute a will. To prove testamentary capacity, we have explained that "'unless the failure of understanding be quite total, reaching to the testator's forgetfulness of his immediate family and property, he is not disqualified from making a will,' for the weak and aged must be accorded the same rights as the strong-minded to dispose of their property." *Hays v. Harmon*, 809 N.E.2d 460, 466 (Ind. Ct. App. 2004) (quoting *Farner v. Farner*, 480 N.E.2d 251, 259 (Ind. Ct. App. 1985)). Undue influence need not be premised on complete lack of testamentary capacity. *See Nichols*, 910 N.E.2d at 229. Accordingly, Eve's argument regarding *Lowe* does not apply to the separate issue of undue influence.

influence the testator, and facts and surroundings giving them an opportunity to exercise such influence.").[9]

[28] Here, the trial court found that William was susceptible to undue influence based on the death of Doreen, his untreated anxiety and depression, his severe CHF and other medical conditions, his isolation from family and friends, and his dependency on others. Appealed Order at 24-25 (#237). Eve does not contend that this finding is clearly erroneous. As for whether Eve exercised undue influence over William, the trial court found that she did based on the following: Eve married William only seven months after Doreen died, and none of William's family or longtime friends were invited to the wedding; Eve made no effort to form relationships with William's family and friends; Eve fired William's longtime caregiver; William significantly relied on Eve; Eve was involved with the procurement and payment of the Purported Will; the Purported Will and the non-probate transfers represented a dramatic departure from what William had previously and consistently expressed as his intent with regard to his assets; Eve inherited virtually all of William's assets to the exclusion of his daughters and grandsons; and the Lexus was purchased when William was no longer driving and just ten days before he died. *Id*. at 25 (#238). In addition, the trial court found that Eve's testimony that she made substantial contributions toward the purchase of the Glen Ridge House and the

---

[9] Eve repeatedly attacks the trial court's consideration of her character. However, Eve's character is a permissible consideration as it relates to whether she exercised undue influence over William.

Lexus was not credible. Finally, the trial court made the following finding regarding Eve's demeanor, which is the only finding Eve challenges:[10]

> Eve's demeanor in court, which consisted of a flat affect during emotional testimony of Paula and Cathy about their father's last hours and during Eve's own testimony, which leaves this factfinder with no confidence that Eve married William because she loved him and with the conclusion that Eve planned to take all of William's money all along.

*Id.*

[29] Eve argues that it was inappropriate for the trial court to consider her demeanor in court because it is not admissible evidence, and that it was also inappropriate for the trial court to make a determination on whether she loved William. Appellant's Br. at 46-47. As to the latter, we note that because the issue before the trial court was whether Eve exercised undue influence over William, her interests and motives were relevant to the resolution of the issue. *See Rhoades*, 993 N.E.2d at 300-01. As to the trial court's consideration of Eve's demeanor, our legal system attaches great significance to the trier of fact's "ability to observe the demeanor of witnesses and thereby evaluate their credibility." *Addison v. Review Bd. of Ind. Emp't Sec. Div.*, 397 N.E.2d 1037, 1039 (Ind. Ct. App. 1979). We have explained,

---

[10] Eve raises new challenges to the trial court's finding of undue influence in her appellant's reply brief, but an appellant may not raise new arguments in her reply brief. *See Felsher*, 755 N.E.2d at 593; Ind. Appellate Rule 46(C).

> Countless times our Appellate Courts defer to findings of fact made by administrative agencies, judges or juries, reviewing evidence only in a light most favorable to the decision below. This standard of review is in recognition of the trier of fact's intelligence and understanding, coupled with their opportunity to personally hear the witnesses and observe their conduct in the act of testifying. In legal concept, the appearance and demeanor of a witness is assumed to be in evidence.

*Id.* (citation and quotation marks omitted).

[30] Assuming, without deciding, that it was inappropriate for the trial court to consider Eve's demeanor when she was not testifying, any error is harmless because the remaining findings support the trial court's conclusion that Eve exercised undue influence over William at the time he executed the Purported Will. Accordingly, the trial court's conclusion that the Purported Will was a product of Eve's exercise of undue influence over William is not clearly erroneous, and we affirm the trial court's judgment in favor of Daughters on their claim that the Purported Will is invalid.

## Section 3 – The trial court's conclusions regarding tortious interference with inheritance are not clearly erroneous.

[31] The trial court concluded that William was susceptible to undue influence and that Eve exercised undue influence over William at the time she became a joint owner of the Glen Ridge House, the Lexus, and the three bank accounts, and that her exercise of undue influence over William is tortious interference with Daughters' expected inheritance. Appealed Order at 27-28 (#246-49). Eve

argues that the trial court failed to apply the proper legal standard in reaching this conclusion.

[32] Tortious interference with an inheritance occurs when "[o]ne who by fraud or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that he would otherwise have received is subject to liability to others for the loss of the inheritance or gift." *Minton v. Sackett*, 671 N.E.2d 160, 162 (Ind. Ct. App. 1996) (adopting RESTATEMENT (SECOND) OF TORTS § 774B (1979)). This action is prohibited "where the remedy of a will contest is available and would provide the injured party with adequate relief." *Id*.

[33] According to Eve, the trial court properly relied on *Minton* but failed to apply the clear and convincing evidence standard to the joint accounts, citing *Womack v. Womack*, 622 N.E.2d 481 (Ind. 1993). Specifically, Eve directs us to the following language: "the party challenging the survivor's right to the proceeds of the joint account must show by clear and convincing evidence that the decedent did not intend the survivor to receive the proceeds of the account without the benefit of a presumption of undue influence." *Id*. at 483; *see also* Ind. Code § 32-17-11-18 ("Sums remaining on deposit at the death of a party to a joint account belong to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intention at the time the account is created."). Although the trial court did not specifically cite *Womack* or Section 32-17-11-18, it indisputably applied the clear and convincing standard to the joint accounts in finding 249: "The Court

concludes that [Daughters] have by clear and convincing evidence established that William did not intend for Eve to inherit the value of the Joint Accounts." Appealed Order at 28. We find no error on this basis.

[34] Eve also contends that the evidence and findings fail to support the conclusion that William did not intend for Eve to receive the inter vivos transfers. Eve's argument ignores findings 237 and 238 pertaining to undue influence, many of which apply to the inter vivos transfers as well as to the execution of the Purported Will. Given our discussion above, we need not repeat those findings here. We conclude that Eve's argument is a request to reweigh the evidence, which we must decline. Accordingly, we affirm the trial court's judgment in favor of Daughters on their tortious interference of inheritance claim.

[35] Affirmed.

May, J., and Pyle, J., concur.